**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|                              |   |                                |
|------------------------------|---|--------------------------------|
|                              | ) | Nos. 04 C 3530, 04 C 3634,     |
| IN RE BALLY TOTAL FITNESS    | ) | 04 C 3713, 04 C 3783,          |
| SECURITIES LITIGATION        | ) | 04 C 3844, 04 C 3936,          |
|                              | ) | 04 C 4697, 06 C 1437           |
|                              | ) |                                |

## MEMORANDUM OPINION

Before the court are defendants' motions to dismiss the amended consolidated class action complaint. For the reasons explained below, the motions are granted.

## BACKGROUND

Plaintiffs have filed several related securities fraud putative class actions against Bally Total Fitness Holding Corporation ("Bally"); three former officers and directors of Bally, Lee S. Hillman, John W. Dwyer, and Paul A. Toback;[1] and Bally's former auditor, Ernst & Young LLP ("E & Y"), for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated by the Securities and Exchange Commission (the "SEC"), 17 C.F.R. 240.10b-5. Plaintiffs allege that defendants violated federal securities laws by publicly disseminating false and misleading corporate reports, financial statements, and press releases primarily through

---

[1] We will refer to Hillman, Dwyer, and Toback collectively, where appropriate, as the "Individual Defendants."

"two related fraudulent techniques": improperly recognizing revenue prematurely and improperly delaying the recordation of expenses. (Amended Consolidated Class Action Complaint ("ACCAC") ¶ 5.)

Lead plaintiff Cosmos Investment Company, LLC previously filed a consolidated class action complaint on behalf of a class consisting of those who purchased or acquired Bally securities between August 3, 1999 and April 28, 2004, inclusive. Defendants' motions to dismiss the consolidated class action complaint were granted. See In re Bally Total Fitness Sec. Litig., Nos. 04 C 3530 et al., 2006 WL 3714708 (N.D. Ill. July 12, 2006) ("Bally I"). Plaintiffs were given leave to file, and did file, an amended consolidated class action complaint (the "amended complaint"). Defendants now move to dismiss the amended complaint.[2]

Our opinion in Bally I contained a detailed recitation of plaintiffs' allegations, which will not be repeated here.[3] Instead, we will describe the changes and additions plaintiffs have made to the complaint. The primary substantive additions are allegations relating to four witnesses-three confidential witnesses as well as David Laird, a former owner of a Planet Fitness, a group of fitness centers that was acquired by Bally during the Class Period. Plaintiffs have also added allegations relating to the

---

[2] Four separate motions to dismiss the amended complaint have been filed by (1) Bally and Toback; (2) Hillman; (3) Dwyer; and (4) E & Y.

[3] One fact that has changed since Bally I was issued is that defendant Toback is no longer Bally's CEO.

following: overstated earnings figures; inadequate accounting controls; the Audit Committee's findings, the preparation of Bally's original Restatement, and a Bally December 1, 2005 conference call with analysts; executive compensation; Bally's discontinuation of defendants Hillman and Dwyer's severance pay; a criminal investigation that was announced in February 2005; and "red flags."

## DISCUSSION

A complaint alleging violations of § 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder must allege that the defendant (1) made a false statement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff justifiably relied, and (6) that the false statement or omission proximately caused the plaintiff's injury. Otto v. Variable Annuity Life Ins. Co., 134 F.3d 841, 851 (7th Cir. 1998). Because plaintiffs allege securities fraud, not only do the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply here, see Sears v. Likens, 912 F.2d 889, 893 (7th Cir. 1990), but also the even more stringent fact-pleading requirements of the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4 et seq., see Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 594 (7th Cir. 2006), cert. granted, 127 S. Ct. 853 (2007).

The primary issue before us is whether the amended complaint adequately alleges defendants' scienter with sufficient, particularized facts.[4]  In Makor Issues, the Seventh Circuit discussed the PSLRA scienter requirement as follows:

---

[4]/  As noted in Bally I:

To satisfy the scienter requirement of § 10(b) and Rule 10b-5, a plaintiff must demonstrate that a defendant either had the "intent to deceive, manipulate, or defraud," Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976), or a "reckless disregard for the truth of the material asserted, whether by commission or omission," Ambrosino v. Rodman & Renshaw, Inc., 972 F.2d 776, 789 (7th Cir. 1992) (internal quotation marks omitted).  "[R]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir. 1977), cited in Makor Issues, 437 F.3d at 600.

"Congress did not, unfortunately, throw much light on what facts will suffice to create [a strong inference of scienter]. Currently three different approaches toward the way to demonstrate the required 'strong inference' exist among the courts of appeals." Makor Issues, 437 F.3d at 601.  One approach is to allow plaintiffs to state a claim by pleading either motive and opportunity or strong circumstantial evidence of recklessness or conscious misbehavior. The second approach declines to adopt the "motive and opportunity" analysis and imposes a more onerous burden of pleading in great detail facts constituting strong circumstantial evidence of deliberately reckless or conscious misconduct. See id. (summarizing case law).  In Makor Issues, the Seventh Circuit chose the middle ground, which neither adopts nor rejects particular methods of pleading scienter, such as alleging facts showing motive and opportunity, but instead requires plaintiffs to plead facts that together establish a strong inference of scienter.  See id. . . . Motive and opportunity may be useful indicators, but nowhere in the statute does it say that they are either necessary or sufficient." Id.
. . .
. . . [T]he "group pleading doctrine," pursuant to which scienter allegations made against one defendant could be imputed to all other defendants in the same action, did not survive the heightened pleading requirements of the PSLRA.  See id. at 603.  "While we will aggregate the allegations in the complaint to determine whether it creates a strong inference of scienter, plaintiffs must create this inference with respect to each individual defendant in multiple defendant cases." Id.

2006 WL 3714708, at *5-6 (emphasis omitted).

Under the PSLRA, a securities fraud complaint must (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1), (2). In other words, plaintiffs must not only plead a violation with particularity; they must also marshal sufficient facts to convince a court at the outset that the defendants likely intended to deceive, manipulate, or defraud.

437 F.3d at 594-95 (some internal quotation marks omitted). "[T]he best approach is for courts to examine all of the allegations in the complaint and then to decide whether collectively they establish [a "strong"] inference [of scienter]." Id. at 601. "Instead of accepting only the most plausible of competing inferences as sufficient at the pleading stage, we will allow the complaint to survive if it alleges facts from which, if true, a reasonable person could infer that the defendant acted with the required intent." Id. at 602.

In Bally I, we found that plaintiffs had not adequately pled scienter. More specifically, we found that Bally's February 2005 press release and the Audit Committee's findings were vague and unspecific as well as hindsight conclusions and thus did not support an inference of scienter; that the characteristics of the Restatement did not support an inference of scienter; that plaintiffs' "motive and opportunity" allegations were insufficient

to establish scienter; and that Bally's violation of its own internal accounting policies did not assist plaintiffs in establishing that the misstatements were made with the requisite intent. We noted that, with regard to the Individual Defendants, there were no allegations of circumstances suggestive of scienter, such as large insider stock sales or specific meetings during which particular financial representations were discussed. Because plaintiffs failed to allege facts giving rise to a strong inference that anyone acting for Bally had the requisite state of mind, they failed to adequately allege scienter against Bally. As for E & Y, we found that the alleged accounting errors, the characteristics of the Restatement and Bally's violation of its internal accounting policies failed to support an inference of scienter and that plaintiffs' "red flag" allegations were insufficient to support an inference of scienter. Taking all plaintiffs' allegations together, we found that plaintiffs had failed to allege sufficient particularized facts to give rise to a strong inference that the defendants acted recklessly or intentionally.

In an attempt to remedy the scienter deficiencies of the original complaint, plaintiffs have repackaged some of their original allegations. In <u>Bally I</u>, we commented on plaintiffs' previous allegations of Bally's reported financial results, which showed that revenue was sometimes understated and losses sometimes overstated. Plaintiffs have now restyled those financial results

(omitting the quarterly results unfavorable to them) and allege that "earnings were inflated or loss understated in a consistent pattern." (ACCAC ¶¶ 27, 180.) These repackaged allegations regarding the restated earnings do not alter our prior conclusion, which is that we can infer from the magnitude of the restatement that significant mistakes were made, but not that defendants acted with the required recklessness or deliberate intent. See Davis v. SPSS, Inc., 385 F. Supp. 2d 697, 714 (N.D. Ill. 2005) ("Davis I") ("Restatements establish that misleading statements were made, but . . . provid[e] no assistance in determining the intent behind the misstatements.").

In addition, plaintiffs have merely boldfaced certain original allegations regarding inadequate accounting controls, adding nothing new. The amended complaint also reiterates the prior allegations of the Audit Committee's findings as set forth in the February press release, adding only that some of these acknowlegments of prior accounting errors were repeated by Toback and Bally's then-CFO Carl Landeck in a conference call that took place on December 1, 2005 (ACCAC ¶ 184), and that errors discovered during the preparation of the original Restatement should have alerted defendants to the possibility that additional errors existed and that internal controls were flawed (ACCAC ¶¶ 182-183).[5]

_____

[5] Plaintiffs have also added the following allegation: "[B]ased on the factual findings of its extensive internal investigation, Defendants Hillman and Dwyer personally caused Bally to recognize membership revenue improperly, despite

These new allegations, like the prior ones, do not support an inference of scienter because they are vague and unspecific[6] as well as hindsight conclusions that do not assist in determining the state of mind behind the misstatements at the time they were made. See Davis I, 385 F. Supp. 2d at 714 ("Permutations of 'fraud by hindsight' do not create an inference, much less a strong inference, of *scienter*.").

Plaintiffs also have made certain substantive additions to the amended complaint. The amended complaint includes additional details regarding executive compensation, the discontinuation of severance pay to Hillman and Dwyer, a criminal investigation that was announced in February 2005, and "red flags" that allegedly should have alerted E & Y to the risk of fraud. Also included are statements by four witnesses. We will consider each category of additional allegations in turn.

**_Executive Compensation_**

Plaintiffs now have included details of the Individual Defendants' compensation, including incentive-based bonuses, for

---

the fact that there was no reasonable empirical basis to do so. What Hillman and Dwyer implemented, Toback knowingly or recklessly ignored." (ACCAC ¶ 199.) This is a conclusory allegation that is based on the unspecific hindsight conclusions of the Audit Committee, which we have rejected as a basis for inferring scienter. The fact that plaintiffs repeat the allegation several times throughout the amended complaint does not render it any more substantial.

[6] Examples of these vague allegations are Toback's statement that when he became CEO in December 2002, "Bally was in the midst of an operational decay, coupled with a lack of faith in our accounting" and Landeck's statement that in 2005, there was a "lack of discipline in the accounting area." (ACCAC ¶ 29.)

the entire Class Period instead of for a single year.  (ACCAC ¶¶ 39-41, 405.)  Even considering the additional detail, our conclusion in <u>Bally I</u> still applies to the compensation allegations: "Regarding the motive to earn bonuses and awards, we agree with the view of numerous courts that these allegations are too common among corporations and their officers to be considered evidence of scienter."  <u>Bally I</u>, 2006 WL 3714708, at *9 (citing, <u>inter alia</u>, <u>Abrams v. Baker Hughes Inc.</u>, 292 F.3d 424, 434 (5th Cir. 2002) ("Incentive compensation can hardly be the basis on which an allegation of fraud is predicated. . . . It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent.")).

### *Discontinuation of Severance Pay*

Plaintiffs alleged in the original complaint that Bally's Audit Committee announced as part of its findings in February 2005 that Hillman and Dwyer had been responsible for a culture of "aggressive accounting" and that their severance pay was being discontinued.  We held that none of the Audit Committee's findings assisted plaintiffs in raising an inference of scienter; the term "aggressive accounting" was unspecific, and the findings were hindsight conclusions.  <u>Bally I</u>, 2006 WL 3714708, at *7.

Plaintiffs have now added allegations that Bally's termination of Hillman and Dwyer's severance pay "effectively amounted to

termination for 'cause'" and that "it must be inferred that both Hillman's and Dwyer's severance were terminated because they had, during the Class Period, engaged in fraud or dishonesty." (ACCAC ¶ 22.) The amended complaint further alleges:

398. Hillman's 2002 Amended and Restated Employment Agreement provided that he was to receive severance unless terminated for Cause. Cause is defined as:
 (i) fraud or dishonesty;
 (ii) failure to cease and/or cure willful misconduct or gross negligence in the performance of his duties, after 30 days written notice; or
 (iii) failure to cure a material breach of the agreement after 30 days written notice

399. Hillman was not employed by the Company when it terminated his severance and decided to explore legal action against him. Therefore, his severance could not have been terminated based on a failure to cure misconduct in his duties or a breach of the agreement after written notice. While Bally's February 16, 2005 press release characterizes the reason for Hillman's termination as "misconduct," the only misconduct that would permit Bally to terminate his severance for cause was fraud or dishonesty. Thus, in the context of its investigation into Bally's false and misleading accounting which led to the Restatement, Bally found Hillman to have engaged in fraud or dishonesty during the Class Period in connection with Bally's materially false and misleading public statements regarding Bally's accounting, financial results, and controls.

400. Similarly, Bally's termination of severance to Dwyer constitutes a finding that he engaged in fraud, dishonesty, illegal conduct or gross misconduct. Upon his resignation, Dwyer entered into a General Release and Settlement Agreement ("Settlement Agreement") that provided for severance compensation and a role as a consultant. The Settlement Agreement provides that Dwyer's consultancy and severance compensation may only be terminated for "cause" under the following circumstances:
 i. He is found guilty of violating a law based on his acts or omissions while he was employed by Bally;

ii. **A good faith determination by Bally that during his employment he engaged in fraud, dishonesty, illegal conduct or gross misconduct; and/or**

iii. During the consultancy period, he failed to perform his duties as required.

401. Dwyer's severance was terminated in the context of the Audit Committee's findings of his responsibility for the accounting manipulations at Bally and his making a false and misleading statement to the SEC. As a result, the only possibility is that Bally found Dwyer to have engaged in fraud, dishonesty, illegal conduct or gross misconduct during the Class Period in connection with Bally's materially false and misleading public statements regarding Bally's accounting, financial results, and controls.

(ACCAC ¶¶ 398-401.)

Hillman argues that he was not terminated by Bally--he resigned--and that the 2002 Amended and Restated Employment Agreement referred to in ¶ 398 was expressly superseded by a Separation Agreement he and Bally entered into in December 2002 upon his resignation. The Separation Agreement, which is attached as Amended Exhibit E to Hillman's memorandum in support of his motion, indeed states that it supersedes all prior agreements and that the 2002 Amended and Restated Employment Agreement is "null and void and of no further force and effect." (Hillman's Mem. in Support of Mot., Am. Ex. E, ¶ 11.) Plaintiffs do not directly respond to Hillman's argument, but merely contend that they are "entitled to the reasonable inference that Bally believed it had a right to terminate Hillman's severance for cause, and did so based on the terms of his Employment Agreement." (Pls.' Mem. in Opp'n to

the Bally Defs.' Mots. at 30 n.12.)   We reject this argument.
Plaintiffs are not entitled to an inference that Bally terminated
Hillman's severance pay based on an agreement that was deemed "null
and void" by Bally and Hillman years before the severance pay was
discontinued.   That would be a wholly <u>un</u>reasonable inference.[7]

    The allegations as to Dwyer also fail to contribute to any
inference of scienter.   It does not necessarily follow from the
fact of the severance discontinuation, as plaintiffs allege, that
"the only possibility is that Bally found Dwyer to have engaged in
fraud, dishonesty, illegal conduct or gross misconduct during the
Class Period."   (ACCAC ¶ 401.)   We disagree.   As plaintiffs
themselves allege, there are two other provisions pursuant to which
Dwyer's severance pay could be terminated in accord with the
Settlement Agreement.   Moreover, plaintiffs assume that Bally
terminated Dwyer's severance pay in accord with the Settlement
Agreement rather than in violation of the agreement.   Bally's
decision to discontinue severance pay to Hillman and Dwyer simply
does not support an inference of scienter as to either defendant;
it does not shed light on determining the state of mind of Hillman

---

        [2/] Furthermore, we find it disheartening that even though both Hillman and
Dwyer entered into separation agreements upon their resignations from Bally and
that plaintiffs expressly rely on the separation agreement with respect to Dwyer,
they completely ignore it with respect to Hillman and instead attempt to create
the misleading impression in the amended complaint that Hillman's Employment
Agreement was still in effect at the time of the discontinuation of his severance
pay.

and Dwyer at the time the financial misstatements were made, nor is it particularized to any specific misstatements.

### *Announcement of Criminal Investigation*

One of plaintiffs' new allegations is that Bally announced in a February 16, 2005 press release that the office of the United States Attorney was conducting a criminal investigation into Bally's prior accounting practices. But the fact that an investigation was opened does not support an inference of scienter on the part of anyone. Plaintiffs do not allege any other facts about the investigation or that the United States Attorney took any action as a result of the investigation.

### *Witness Allegations*

There are new allegations relating to four witnesses, three of whom are confidential witnesses. The Seventh Circuit has held that while plaintiffs are not required to provide "name, rank, and serial number" for confidential sources, they must describe the sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." <u>Makor Issues</u>, 437 F.3d at 596 (internal quotation marks omitted). "[V]ague statements of confidence are insufficient to establish a witness' reliability," and "any information witnesses received second- or third-hand is insufficient to establish its reliability." <u>Davis v. SPSS, Inc.</u>,

431 F. Supp. 2d 823, 831 (N.D. Ill. 2006) ("<u>Davis II</u>").  When
assessing the particularity of confidential witness allegations, a
court should examine "the level of detail provided by the
confidential sources, the corroborative nature of the other facts
alleged (including from other sources), the coherence and
plausibility of the allegations, the number of sources, the
reliability of the sources, and similar indicia."  <u>In re Cabletron
Sys., Inc.</u>, 311 F.3d 11, 29-30 (1st Cir. 2002); <u>see also</u> <u>California
Pub. Employees' Ret. Sys. v. Chubb Corp.</u>, 394 F.3d 126, 147 (3d
Cir. 2004).

We will begin with plaintiffs' non-confidential witness, David
Laird.

### *David Laird*

The Laird allegations arise out of an action filed by Laird
and others against Bally, Toback, Hillman, and Dwyer in the United
States District Court for the District of Massachusetts (the
"Massachusetts Action").[8]  Laird is the former owner of Planet
Fitness, a chain of fitness centers that Bally acquired for cash
and Bally stock in spring 2002.  He and his co-plaintiffs alleged
a variety of claims sounding in contract and fraud in relation to
the sale of the fitness centers.  The amended complaint in the
instant case contains allegations taken from both the complaint in

---

[8]  The case is now closed.  Hillman and Dwyer's motions to dismiss for
lack of personal jurisdiction were granted, and all remaining claims were then
dismissed with prejudice in late 2006.

the Massachusetts Action (the "Massachusetts Complaint") and an affidavit Laird filed in conjunction with the Massachusetts Action (the "Laird Affidavit"). Most of the allegations contained in the Massachusetts Complaint are irrelevant to defendants' scienter in this case. The portions that plaintiffs highlight are as follows: (1) the allegation in the Massachusetts Complaint that during the negotiations for the purchase of Planet Fitness, Hillman told Laird's partner, Scott Baker, that Bally stock was a "bargain" at $23 per share and that Bally would "continue to grow its earnings" (ACCAC ¶ 99); and (2) the allegations in the Laird Affidavit pertaining to Toback's alleged "Starter Kit Scheme" (ACCAC ¶¶ 104-111).

The alleged comments by Hillman that the stock was a bargain and that Bally would continue to "grow" its earnings are classic examples of sales "puffing" and general corporate optimism, which are immaterial for purposes of the federal securities fraud laws.[9] See In re Ford Motor Co. Sec. Litig., 381 F.3d 563, 570 (6th Cir. 2004); San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 811 (2d Cir. 1996) (statements about earnings optimism are mere puffery); In re Staffmark, Inc. Sec. Litig., 123 F. Supp. 2d 1160, 1173 (E.D. Ark. 2000) (statement that company's stock was undervalued was puffery). Moreover,

---

[9] "The crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company." Makor Issues, 437 F.3d at 596.

plaintiffs' contention that Hillman knew that the stock was "artificially inflated" does not follow from Hillman's statement that Bally's stock was a "bargain."

With respect to the alleged "Starter Kit Scheme," Laird states in his affidavit that Toback boasted that he had originated the idea to introduce "supplemental services" (such as personal training, juice bars, and sales of dietary supplements) to Bally's health clubs, Toback was in charge of the program, and Bally's clubs made half of their profits from the supplemental services. (ACCAC ¶¶ 105-106.) To promote the supplemental services, Bally created a "Starter Kit" for new members that contained samples of protein shakes, dietary supplements, energy bars, and the like. After Bally bought the Planet Fitness clubs, Laird (who was still involved in the operation of the clubs) was told by Bally representatives that each new member was to receive a Starter Kit after the three-day period during which the member could rescind his or her contract. (ACCAC ¶ 107.)

When some problems arose regarding storing and displaying the Starter Kits, Laird called Sandor Feher, who was Bally's regional vice president for Laird's region. During their conversation, Feher told Laird that Bally actually did not want Laird's clubs to distribute the Starter Kits. "As Mr. Feher explained it, Bally would book some revenue for the sale of each Starter Kit at the time the new member signed up--that is, part of the initiation or

prepayment fee would be allocated to the sale of the Starter Kit. But once that sale was booked, Bally had no interest in actually making sure that the member **got** the Starter Kit." (ACCAC ¶ 108.) Feher told Laird that this "policy" of not giving members the Starter Kits came "right from the top"--from Toback, who, according to Feher, said that "we all make more money this way." (ACCAC ¶ 109.) Plaintiffs allege that the "Starter Kit scheme violated GAAP because . . . revenue was booked without the earnings process being completed." (ACCAC ¶ 111.)

Laird's allegations regarding the "Starter Kits" are insufficient to establish scienter against any of the defendants. What Laird actually learned firsthand from Toback--that Toback created the supplemental services and that they were profitable--is innocuous. Laird does not claim to have firsthand knowledge of the crux of the matter, an alleged scheme to improperly account for revenue. Laird allegedly learned about that from Feher, which is problematic because we are left to speculate as to how Feher learned that information--firsthand? Secondhand? Rumor? The allegations are therefore unreliable and an insufficient basis for an inference of scienter. See, e.g., Davis II, 431 F. Supp. 2d at 831 (rejecting plaintiffs' attempt to establish scienter through secondhand information).

Another reason why Laird's testimony is insufficient to establish scienter, as defendants Bally and Toback point out, is

that it does not concern Bally's corporate-level accounting. Even if the "Starter Kit" allegations were reliable, Laird is unable to provide any information about what relevance the purported scheme had to what Bally ultimately reported on its financial statements. Courts have rejected descriptions of localized problems by local employees as a sufficient basis for scienter because those employees do not and cannot know whether or how such problems were incorporated into the company's overall financial statements. <u>See, e.g.</u>, <u>id.</u> at 832 (rejecting witnesses' statements about an employee's accounting scheme as a basis for scienter where it was unclear whether or how the employee's "conduct was integrated into the company's world-wide financials").

The Laird allegations fail to raise an inference of scienter. We now turn to the confidential witnesses.

*CW1*

It is alleged that CW1 was "one of several Area Directors of Bally" from early 2002 to late 2003. He was responsible for managing a group of clubs in a particular area and reported to one of four regional vice presidents who then reported to "top executives." (ACCAC ¶ 112.) CW1 states that he had "run" several fitness clubs prior to joining Bally and as a result "became familiar with proper accounting for fitness membership revenue and expenses and product sales under GAAP." (ACCAC ¶ 113.)

CW1 attended quarterly meetings at Bally's corporate offices in Chicago at which financial results were discussed. Present at the meetings were all area directors and regional vice presidents, as well as Bally's top executives, including Hillman, Dwyer, and Toback. CW1 attended two meetings where Hillman was present, and concluded that, "based on Hillman's comments at these[] meetings regarding Bally's financial results, Hillman was familiar with every aspect of Bally's financial results and operations. According to CW1, no policies were implemented at Bally without Hillman's knowledge and approval." (ACCAC ¶ 115.)

A reasonable person could not infer from CW1's statements about Hillman that Hillman acted with the requisite recklessness or intent. CW1 does not allege that he ever spoke with Hillman or had knowledge of any specific reports or materials that Hillman reviewed that would have put him on notice of improper accounting. Instead, CW1's statements are sweeping generalizations based on Hillman's comments (none of which are specifically alleged) about the company at a quarterly meeting. It strikes us that CW1's conclusions about Hillman are another species of the "must have known" allegations about senior executives that we rejected in Bally I, 2006 WL 3714708, at *9.

The complaint also contains the following allegations from CW1 concerning the supplemental services offered by Bally:

116. In addition to being an Area Director, CW1 was entitled to certain additional compensation based on the

earnings of the Bally clubs for which he had responsibility. As a result, CW1 had numerous one-on-one discussions with Toback, in the form of telephone conversations and at the quarterly meetings, regarding the accounting for various aspects of revenue and expenses.

117. As part of these discussions, CW1 had several conversations with Toback in the Fall of 2002 regarding the Starter Kit scheme described above and in the Laird Affidavit.

118. Bally was providing products to CW1 to hand out in Starter Kits, including nutritional bars and supplements, that were expired and could not be given out to new members to complete the sale. CW1 expressed his concerns to Toback that CW1 was not getting credit towards his additional compensation for sales of Starter Kit products because he was not actually delivering them to members, and therefore the revenue could not be taken under provisions of GAAP. Toback told CW1, "don't worry, you will be given credit for product sales." When CW1 questioned Toback as to how this was possible if the sale wasn't completed, Toback told CW1 that revenues would be recognized in spite of the fact that the Starter Kits were not being delivered to new members.

119. CW1 knew from conversations with other Area Directors that the Starter Kit scheme was widespread and that Starter Kits were not being delivered to members at the majority of Bally's locations.

120. According to CW1, Toback explicitly stated that Bally's method of accounting for the Starter Kit revenue in this manner had "been approved by E & Y."

(ACCAC ¶¶ 116-120.) CW1 also alleges "[a] similar accounting scheme" for revenue from sales of personal training. According to CW1, Toback pushed area directors to sell personal training services to new members and told CW1 that Bally would recognize the revenue immediately, even before the services were performed, and CW1 would get credit for the revenue in the calculation of his

additional compensation. (ACCAC ¶ 121.) When questioned in fall 2002 by CW1, Toback said that if members didn't use the services, it was better for Bally because it could take the revenue without paying for the personal trainers and that this accounting had been explicitly approved by E & Y. (ACCAC ¶¶ 122-23.)

It is further alleged:

126. . . . Bally prepared two separate sets of financial statements and accounted for revenue and expenses differently for different purposes.

127. The monthly reports that CW1 received as an Area Director--and that formed the basis of Bally's publicly reported financial statements--had one set of figures based on Bally's improper accounting practices. According to this set of numbers, CW1's clubs were extremely successful financially.

128. The second set of financial statements, which CW1 received quarterly from Ted Noncek and which formed the basis for CW1's additional compensation, claimed CW1's clubs were performing poorly. **Unlike the first set of numbers, this second set of financial statements was prepared in accordance with GAAP.** Thus, Bally knowingly reported inflated earnings in its publicly filed financial statements while, for the purpose of calculating CW1's additional compensation, internally accounting for earnings in compliance with GAAP, resulting in drastically reduced earnings.

(ACCAC ¶¶ 126-128.)

Plaintiffs argue that it is reasonable to infer that because CW1 had managed various fitness clubs, he knew how to properly account for their revenue on a consolidated, company-wide basis under GAAP. We disagree. CW1's allegations are unreliable because he cannot testify competently about accounting matters. CW1 was

not an accountant; like David Laird, CW1 did not work at corporate headquarters, and he was not privy to Bally's bookkeeping practices. It is clear that CW1's perspective on accounting was limited to the question of what commissions he would receive--in other words, what was in it for him. "Giving credit" to CW1 for product sales does not equate to a company-wide decision about revenue recognition. The allegations that Toback stated that certain methods of accounting had been approved by E & Y actually cut against an inference of scienter. And as against E & Y, CW1 does not purport to have personal knowledge of what E & Y knew at the time of the audits.

As for the "two sets" of financial statements, these allegations are entirely too vague to permit an inference of wrongdoing. The complaint does not tell us anything about the specific contents of the reports, their intended use, who prepared them, who reviewed them, what GAAP principles were violated, or how the statements affected Bally's company-wide statements. Plaintiffs do not meet the requirement of alleging fraud with particularity simply by stating that the two sets of statements showed operations as "extremely successful financially" and "performing poorly." It is not even alleged that the two sets of statements were measuring the same things or that they contained the same categories of financial information.

Because CW1's allegations are unreliable and because they are not supported with particularized facts, they fail to provide a basis for an inference of scienter.

### *CW2*

CW2's allegations are very brief. CW2 was a "senior executive" in Bally's marketing department from late 2003 to early 2005[10] "who participated in numerous meetings with senior executives, including Toback and Dwyer, addressing issues related to members." (ACCAC ¶ 388.) In mid- to late-2004, CW2

> participated in meetings with Toback and Dwyer in which each of them acknowledged that Bally improperly recognized revenue prematurely when signing up new members by claiming the entire contract dollar amount as revenue immediately rather than spreading it out over the life of the contract. According to CW2, "Toback and Dwyer knew that Bally was improperly recognizing revenue prematurely." Toback and Dwyer had been aware of this situation for years, but failed to correct it. According to CW2, Toback and Dwyer felt "trapped in a situation they did not want to be in," but which they nevertheless continued to knowingly permit.

(ACCAC ¶ 389.) Moreover, "[a]ccording to CW2, the SEC investigation was based on its belief that the defendants had manipulated Bally's stock price." (ACCAC ¶ 390.)

Like Laird and CW1, CW2's testimony lacks reliability. CW2 was not an accountant and did not work at Bally's corporate

---

[10]/ Defendant Hillman had already left Bally by the time CW2 began employment.

headquarters. He fails to clear the first hurdle, which is to explain why it is likely that Toback and Dwyer would discuss a company-wide accounting matter with a marketing executive. CW2's allegations are also extremely vague. Given the adroit use of words in certain parts of the amended complaint, it is notable that plaintiffs have chosen to allege what was "acknowledged"--a fuzzy word--instead of what was actually said by Toback and Dwyer at the meetings. It is impossible to discern what part of the allegation is based on fact and what part is CW2's conclusion. Furthermore, he does not give any details about the locations or dates of the meetings he attended, who was in attendance, or what was discussed. And as for what Toback and Dwyer "knew," were "aware" of, or "felt," CW2 fails to state any basis for these conclusions. We are also perplexed by CW2's assertion regarding the SEC's belief. Given that CW2 is not alleged to have been employed by or an agent of the SEC, he cannot competently testify about that agency's "belief."

Because CW2's allegations are unreliable and unparticularized, they fail to raise an inference of scienter. See Davis I, 385 F. Supp. 2d at 716 (rejecting confidential witnesses' testimony as a basis for inferring scienter where no factual allegations were provided to support the assertions, such as an explanation of how the witnesses acquired their knowledge).

*CW3*

CW3 was "a Mid-Level Manager in the Accounting Department of Bally from mid-2004 through early 2005, during the time Bally was preparing its restated financial statements." (ACCAC ¶ 172.) CW3's only allegation is the following:

> According to CW3, during the later half of 2004, Bally's internal investigation focused on gathering financial information that existed during the Class Period in an attempt to identify how the Bally accounting entries should have been made at the time. CW3 personally participated in this process of gathering contemporaneous financial information. According to CW3, the investigation "focused on revenue recognition problems and the way in which Bally had been recording revenue and expenses."

(ACCAC ¶ 173.)

CW3 adds the least to the mix because he is not a true witness. He joined Bally after the Class Period ended and offers nothing but hindsight conclusions, which we have already rejected as a basis for inferring scienter, see supra. Moreover, CW3's non-specific allegations do not cover any new territory; we are already aware of the subjects of the internal investigation from plaintiffs' other allegations.

CW3's allegations fail to raise an inference of scienter.

### *Red Flags*

In Bally I, we considered twelve "red flag" items that plaintiffs alleged should have prompted E & Y to exercise greater professional skepticism during its audits and agreed with E & Y that plaintiffs had attempted to "cherry-pick" a handful of generalized risk factors, label them as red flags, and assemble

them in order to show scienter. 2006 WL 3714708, at *13. True red

flags are "specific, highly suspicious" facts or circumstances

available to an auditor at the time of the audits. Riggs Partners,

LLC v. Hub Group, Inc., No. 02 C 1188, 2002 WL 31415721, at *9

(N.D. Ill. Oct. 25, 2002).

The amended complaint alleges the same twelve red flags,

except in a different order:

1) the employment of ineffective accounting staff
2) the use of unusually aggressive accounting practices
3) the failure by management to display and communicate
   an appropriate attitude about financial reporting
4) ineffective information systems
5) the failure to correct known reportable conditions
   on a timely basis
6) inadequate disclosure of Bally's accounting policies
7) the need to obtain additional debt or equity financing
   to stay competitive
8) frequent acquisitions during the Class Period
9) unusually rapid growth or profitability during the
   Class Period
10) Hillman and Dwyer's previous employment with E & Y
11) significant portions of management's compensation being
    contingent upon achieving aggressive targets for
    operating results
12) senior management's significant financial interests in the
    company during the Class Period

(ACCAC ¶ 413.)

Because the allegations of Items 1-4 are virtually identical

to those that were originally alleged, they are rejected as a basis

for inferring scienter because, as explained supra, the Audit

Committee's findings involve hindsight and do not shed light on E

& Y's knowledge at the time of the audits. See, e.g., Davis I, 385

F. Supp. 2d at 713-14 (red flags cannot arise out of later

discoveries). Items 6 and 10 are also virtually the same as alleged before; our previous conclusion that they are merely risk factors that do not rise to the level of red flags stands. See Bally I, 2006 WL 3714708, at *13.

The original version of Item 5 (failure to correct known reportable conditions) was too weak to raise a strong inference of scienter. Plaintiffs alleged that E & Y stated in 2004 that it had been aware of material weakness in "internal accounting control" for the years 2001-2003 and took that into account in performing its audits. In our opinion, it did not follow from that allegation that there was a failure to correct a "known reportable condition"; we remarked that it was not even clear what a "known reportable condition" is. Id. Plaintiffs have now added a footnote explaining that a "material weakness in internal control" is a "known reportable condition" as it is defined in the Auditing Standards of the American Institute of Certified Public Accountants. (ACCAC ¶ 413(e).) Even so, we are still unpersuaded that this factor amounts to anything more than a weak risk factor. See, e.g., Reiger v. Price Waterhouse Coopers LLP, 117 F. Supp. 2d 1003, 1009 n.5 (S.D. Cal. 2000) (noting that an allegation that an audited company had weak internal accounting controls is an unparticularized boilerplate "red flag" present in almost every securities fraud action that does not raise even a weak inference of scienter).

Plaintiffs have now beefed up five purported red flags (Items 7, 8, 9, 11, and 12) that we previously found to be problematic because they were not based on any factual allegations. In Item 7, plaintiffs alleged that Bally needed to obtain additional debt or equity financing to stay competitive, but did not allege any facts to support this conclusion. Now plaintiffs allege that Bally needed to obtain additional financing because its negative ratio of assets to liabilities was lower than the industry average. (ACCAC ¶ 413(g).) They fail to allege any facts, however, showing that Bally would not have been competitive but for the financing it obtained.

Item 8 cites Bally's frequent acquisitions during the Class Period. In the original complaint, plaintiffs failed to allege any facts showing that Bally had a merger calendar that was more active than comparable entities. Plaintiffs have now added the following sentence: "Bally's acquisition activity in terms of annual acquisition costs as a percent of Bally's annual sales and total assets was significantly greater than its publicly traded competitors in at least 1999 and 2001." (ACCAC ¶ 413(h).) Because plaintiffs chose to compare Bally's acquisition activity to only two publicly-traded companies, this is a virtually meaningless assertion. Moreover, plaintiffs qualify the assertion with the phrase "in terms of annual acquisition costs as a percent of Bally's annual sales and total assets," and because there are no

further facts alleged, it is unclear what plaintiffs mean by the term "significantly greater." This item does not rise to the level of a red flag.

The next red flag, Item 9, alleges that Bally's unusually rapid growth or profitability should have alerted E & Y to the risk of fraud. The original complaint was deficient because it did not allege unusually rapid growth when compared to other companies. Plaintiffs have now merely added an allegation that Bally's continuous financial improvement throughout the Class Period was "unusual" because it "presented a consistent trend of highly favorable results over a prolonged period." (ACCAC ¶ 413(i).) This is another conclusory, hollow assertion that fails to bolster the original allegations.

We previously rejected Items 11 and 12 (significant portions of management's compensation being contingent upon aggressive targets and senior management having had "significant financial interests in the entity") because plaintiffs failed to allege that Bally's executives had incentives or financial interests that were much larger than those of executives at comparable entities. Plaintiffs now have added some details concerning bonuses, stock options, and stock grants to Bally's five highest-paid executives and also allege that these forms of compensation were "significant to the recipients because they constituted a large portion of the recipients' annual income" and that the stock award was "unusual

because Bally's [two] publicly traded competitors did not award stock to their executives." (ACCAC ¶ 413(k).) Plaintiffs also have added some details of senior management's stock holdings during the Class Period. (ACCAC ¶ 413(l).) Plaintiffs still have not adequately alleged, however, that management had incentives or stock holdings that were comparatively much larger than their counterparts. That Bally's two publicly-traded competitors did not award stock to their executives is neither here nor there because those executives may have been compensated in other ways. Moreover, it is not at all unusual for high-level executives to receive significant amounts of their compensation in stock or stock options.

In sum, the "red flags" as alleged in the amended complaint are a negligible improvement on the original "red flags." Plaintiffs have again failed to identify any specific, highly suspicious facts or circumstances available to E & Y at the time of the audits.

### *The Amended Complaint as a Whole*

Plaintiffs have added little of substance to the amended complaint. They have recycled their previous insufficient allegations pertaining to the magnitude of the restatement and added more insufficient "fraud by hindsight" allegations. The purported "red flags" have been revamped but still offer nothing substantial; the facts alleged by plaintiffs are insufficient to

meet the "especially stringent" standard for an outside auditor's recklessness under the PSLRA, which is "a mental state so culpable that it approximates an actual intent to aid in the fraud being perpetrated by the audited company." PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 693 (6th Cir. 2004) (internal quotation marks omitted).

None of plaintiffs' four new witnesses held positions during the relevant time that rendered them privy to Bally's contemporaneous bookkeeping, let alone to the specific accounting that went into the company's financial reporting. The witnesses' testimony also suffers from reliability and vagueness problems. "A court cannot aggregate allegations relying on confidential witnesses' testimony that have not been pleaded with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc., 388 F. Supp. 2d 932, 945 (S.D. Ind. 2005).

As in Bally I, plaintiffs argue that the facts alleged, when considered in their totality, permit the reasonable inference that defendants acted knowingly or recklessly. (Pls.' Mem. in Opp'n to the Bally Defs.' Mots. at 4-5.) They cite Makor Issues for the proposition that when faced with "two seemingly equally strong inferences" regarding scienter, one favoring the plaintiffs and one favoring the defendants, it is inappropriate for the court to make

a determination as to which inference will ultimately prevail.  437
F.3d at 602.  The problem with the amended complaint, however, is
that we are unable to draw two seemingly equally strong inferences.
The amended complaint simply fails to allege facts with
particularity that give rise to a strong inference of scienter.[11]
The inference must not only be reasonable; it must be strong, and
the amended complaint again fails to meet this standard.[12]

### *Dismissal*

Count I of the amended complaint, the § 10(b) claim, will be
dismissed.  Count II, the § 20(a) "control person" claim against
the Individual Defendants, will also be dismissed because if there
is no actionable underlying violation of the securities laws, there
can be no control person liability.  See Sequel Capital, LLC v.
Rothman, No. 03 C 678, 2003 WL 22757758, at *17 (N.D. Ill. Nov. 20,
2003); In re Allscripts, Inc. Sec. Litig., No. 00 C 6796, 2001 WL
743411, at *12 (N.D. Ill. June 29, 2001).

Defendants ask the court to dismiss the amended complaint
without leave to amend and with prejudice.  At the conclusion of

---

[11]/  Plaintiffs assert that in the event they have not adequately pled
scienter against the Individual Defendants, we can impute scienter to Bally by
virtue of the scienter of its non-defendant agents.  Plaintiffs point to the
Audit Committee's finding that Bally's vice president and controller, Ted Noncek,
and vice president and treasurer, Geoff Scheitlin, had engaged in "improper
conduct."  (Pls.' Mem. in Opp'n to the Bally Defs.' Mots. at 11 n.4.)  We are
unpersuaded.  "Improper conduct" is a vague allegation that tells us nothing
about the nature of the conduct, let alone the state of mind of Noncek or
Scheitlin.

[12]/  In view of this ruling, we need not address E & Y's alternative
argument that the amended complaint should be dismissed for failure to allege
loss causation.

their brief in response to E & Y's motion to dismiss (but not in their brief in response to the Bally Defendants' motion to dismiss), plaintiffs make only a cursory request for leave to amend their complaint yet again. They do not provide a proposed second amended complaint or offer any indication of what additional facts they would plead.

In Bally I, we pointed out numerous deficiencies in the original complaint with regard to scienter, and we gave plaintiffs leave to amend. The amended complaint failed to cure those deficiencies, and plaintiffs fail to propose another amendment that would meet the stringent pleading requirements of the PSLRA. The court has devoted a great deal of time and effort evaluating both the original complaint and the amended complaint and issuing detailed opinions. We see no indication that plaintiffs can file an amended complaint that would survive another motion to dismiss. Under these circumstances, we will dismiss the amended complaint with prejudice. See DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 391 (9th Cir. 2002) (dismissal with prejudice of securities fraud complaint was proper where plaintiffs "failed to come forward with additional facts that would meet the scienter pleading requirement"); Davis II, 431 F. Supp. 2d at 833-34 (denying leave to amend and dismissing complaint with prejudice in PSLRA action where plaintiffs twice had failed to adequately plead

scienter and court was confident plaintiffs had given it their "best shot").


## <u>CONCLUSION</u>

For the foregoing reasons, the following motions to dismiss the amended consolidated class action complaint are granted: (1) the motion of Lee S. Hillman; (2) the motion of John W. Dwyer; (3) the motion of Bally Total Fitness Holding Corporation and Paul A. Toback; and (4) the motion of Ernst & Young LLP. The amended consolidated class action complaint is dismissed with prejudice.


DATE:          February 20, 2007


ENTER:         _____

               John F. Grady, United States District Judge